United States v. Santiago May it please the court, Stephen Manning for Gerard Santiago. In this case, the three-count month gap between those periods of time. With respect to the second time frame, the defendant pleaded guilty to two February 2023 distribution offenses. With respect to the first time frame, which was alleged in count one, the defendant did not plead guilty and challenged that conduct, which involved an alleged distribution in May of 2021 at a casino in Connecticut. But it was this challenged conduct, not found by a jury or in a guilty plea, that drove the sentencing in this case. There was a written plea agreement that estimated the guidelines at 15 to 21 months. At the time of sentencing, due to a recalculation of history, the range was 27 to 33. But the court imposed a 96-month sentence based upon the preponderance of the evidence findings at the Fatico hearing that the casino conduct resulted in the death of Mr. Berwani. And didn't Mr. Santiago plead guilty knowing precisely that his role in that death would be the subject of a Fatico hearing? Yes, he did, Your Honor. The state of mind element with respect to this upward departure slash variance is the key driver of this sentence. After the Fatico hearing, the district court found that Mr. Santiago had distributed cocaine at the casino and that this cocaine was, in fact, laced with fentanyl. The court also said in its decision, there's no evidence or argument that Santiago specifically knew that the cocaine was laced with fentanyl, much less that he intended to harm or kill Mr. Berwani. But at the time of sentencing, the district court found that the defendant knew of a high likelihood that what he sold to Ethan was going to have fentanyl in it. And the court said, it does not make a difference in my mind whether you intentionally yourself laced whatever you sold to Ethan Berwani with fentanyl. He equated those, he equated actually personally lacing cocaine with the likelihood, a high likelihood, that Mr. Santiago was aware that there would be fentanyl in this cocaine. But the record does not support that. There's no evidence. I just want to get to the evidence. That's not, that wasn't a legal error, was it? I thought that for application of this upward departure, a person would need to intentionally cause a death or knowingly risk such a death. Yes, Your Honor. The standard under the guidelines is knowingly risk the death. And that, the court, what the court said in that regard, he's, the court is finding the state of mind element, knowingly risk. And in that context, the court found that Mr. Santiago was aware of a high likelihood that this particular cocaine was laced with fentanyl. And your position is there was nothing in the record to support that? There's no evidence of that at all. There's no evidence that this particular cocaine was going to have fentanyl in it. There's no evidence that, there's no evidence regarding any knowledge that Mr. Santiago might have had regarding the characteristics or properties of this particular cocaine, whether it was laced by someone else or not. But the judge treated Mr. Santiago as if he had personally laced the cocaine. In the Fatico hearing, the government put forth expert testimony. And that expert was, what the risk was, that it was laced with fentanyl. And the expert put it at 10%, right? 10%. The risk was 10%, not a very high likelihood that this particular individual knew about this particular, the properties of this particular cocaine. That's where the court went at sentencing. And that is not supported by the record. And there are other cases where there is, you know, there are findings. Your argument here is that 10% is not a high enough likelihood for application? 10% does not correspond at all to the district court's view that Mr. Santiago had an actual knowledge or awareness that there was a very high likelihood that this cocaine was laced with fentanyl. In your view, what would the expert have had to say? 51%? What would the expert have had to say in your view to have a knowing risk? Very high likelihood is above 50%. It's perhaps in the range of 75%. It's definitely not 10%. 10% is, and that 10% did not have anything to do with the particular product at issue at the casino. And there's case law in this circuit where there are departures based on a defendant having actually personal knowledge, notice, that this particular substance was excessively dangerous. And correct me if I'm wrong, the record is not completely, it's not pellucid on this, but from my reading of it, these young men were certainly not first time users of cocaine. No, Your Honor. No, no, he was not. He was not. And how do we know that? I mean, the slang, the familiarity with the slang seems to indicate that. There was a... They use when they're talking about it, when they're buying it, when they're dealing with each other, that these kids... Yeah. One of his friends who was with him testified in the Fatico hearing and stated that Mr. Berwani had previously used cocaine with him. So clearly he had previously used cocaine. There was testimony of that effect. Thank you. I reserve two minutes.  Thank you, Your Honor. Good morning. Christopher Schmeiser with the United States. May it please the Court. I wanted to actually start off, and I will address the issue that counsel has raised regarding procedural reasonableness. But I wanted to step back for a second and very briefly discuss a subject of reasonableness for the simple reason that there are many 3553A factors that the Court considers in determining an appropriate sentence. Judge Meyer, one of the most careful judges that I've had the favor of practicing in front of, was someone who took that very seriously and looked at this entire record very closely in fashioning the actual sentence that the Court did. The Court entered a sentence of 96 months. It was higher than the advisory guidelines range, but it was well below the statutory maximum. And the Court had looked at this defendant's particular background, had looked at the particular facts of this case, had looked at, frankly, and this is an unusual case because this case had a videotape of much of the conduct that was present in this case so that the judge could appreciate how the defendant had interacted with this college student and, at the end of the day, how the defendant had interacted with this individual when he had come from the time of the sale in the bathroom, gone out on the gambling floor, sat there, and the defendant was with him. And when the victim collapsed, the defendant basically stood over him. And the defendant was the one who, at that time, who really could have changed things. He basically used that opportunity to walk away. I found that, I mean, nonsensical is too strong a word, and this was just simply my reaction to the film and so forth. If Santiago is selling cocaine laced with fentanyl, why is he walking out and standing next to the victim at the gambling table? That doesn't make any sense to me. Your Honor, from the government's perspective, what happened in the bathroom was that Santiago sold the victim a small amount of cocaine that was laced with fentanyl. And then what happened at that point is that it was clear that there was interaction between the two because the victim put the defendant's phone number in his phone with an indication of a nickname next to that phone number. Apparently, so the — So he could buy more cocaine. So he could buy more cocaine. But what happened is, having gotten a sample from the defendant, the two of them went out together, went out to the blackjack table. Presumably, at least from the government's perspective, the defendant was there to actually be the ready source if this individual said, hey, I like that sample. Well, he had a phone number. That doesn't make any sense. Well, except for the phone number, respectfully, you have to call the person. You have to find the person. You have to meet up. Santiago was walking out there. He's walking out with him. And they're standing next to each other. And he's a ready source right there. Santiago walked away, met with a friend of his, came back and stood next to him. And he's continuing a veil of supply. It was clear from the time — Okay. So as it relates to that issue, Your Honor, and this is part of the application of the departure, I mean, we start with the situation where there was a death here. From the government's perspective, the death, and I think from the court's perspective, the government was — the death was directly causally linked to actions by the defendant. So from the government's perspective, and I believe the court's perspective — Which actions? The fact that the victim received cocaine or drugs from the defendant and then died. So just the fact — Well, assume hypothetically that the — let's just assume hypothetically the accuracy of the experts pegging this is 10 percent. How can we extrapolate from 10 percent that the seller knew death is likely to occur? I don't — Let me pivot to the — Help me with that. Yeah. Let me pivot to the application of the departure. Because when you look at the actual departure under 5K2.1, the departure discusses — and it seems like it's intended to deal with death-resulting cases, right? When you have a death in a case, what should a judge do? And you actually look at this departure, the departure is very clear. It starts with loss of life does not automatically suggest a sentence at or near the statutory maximum. I think that the reason for that inclusion right at the very top was the natural tendency of judges, when you have a death case, a death-resulting case, to say, look, this should get a very high sentence. So to answer your question, Your Honor, I think the Sentencing Commission included a series of factors to say, all right, between the typical case and the death-resulting case, there's a whole different range of potential knowledge, intent, conduct. And at the end of the day, we don't want you to start with, like, the highest sentence. Okay. So go back and judge and look at the conduct that was involved here and make an assessment. And then it talks about various factors under that departure. And it says that the extent of the increase should depend on the dangerousness of the defendant's conduct. So that's an issue for the Court to consider. The extent to which death or serious injury was intended or knowingly risked. So the issue then became, I believe, for Judge Meyer, was determining what does it really mean to be knowingly risked. And that was a careful consideration in presentation of evidence before the district court. One of the reasons for calling the expert was to discuss, all right, we all heard about fentanyl, you know, starting in whatever it was, you know, 19 or whatever, certainly not by 2021. We had problems with it five, six, seven years before. But it had escalated in terms of number of deaths, issues of contaminated product. So by the time the court was considering this and the time that the expert was discussing when this took place, the expert was talking about that, look, in the New Haven region, you had a substantial number of cases where you had cocaine which had been adulterated with fentanyl. And with naive users, who are basically people. Where you're going that any sale of cocaine involves a knowing risk? When it involves, I think what the court was looking is that this particular defendant, who had many, many years of drug distribution, who also had his own addiction issues and use issues and had admitted a series of family members had actually suffered overdoses because of fentanyl, that he was very much aware, perhaps in a way that other people in the public, of that when you actually sell a product like cocaine or heroin or fentanyl. Well, aren't the students also aware of that? I mean, the knowledge that there was a fentanyl problem and that cocaine was sometimes laced with it, I mean, it was all in the papers. Everybody knew that. And these students were, they were willing buyers of cocaine. They were, one of the ways they had fun was partying with cocaine. Well, Your Honor, I would come back to the actual departure itself. It's focusing on the defendant, the defendant's conduct in that context. And it's talking about did the defendant knowingly risk when he was basically, knowingly risked his death by selling cocaine or, frankly, any other narcotic product. And this individual had specific knowledge based on his background, based on his use, based on his personal experiences. Well, Your Honor, can you refresh my recollection specifically about what the record shows about his relatives that had overdosed on fentanyl? Well, I believe that it reflects in the discussion at the FATIGO hearing, not the FATIGO hearing at the sentencing, but I think it's also mentioned in the PSR that there had been an uncle or other close family members that had actually overdosed because of fentanyl. But I think the important point, coming back to the Court's question about knowingly risk, is that this was information that was, some of the information may have been in possession of the victim, but to a much greater degree, and the individual who was actually purveying this product, that was a knowing risk. I want to also briefly address the risk that you actually are, if you're selling cocaine, that it may be adulterated with fentanyl, and that in this particular case, the defendant was actually interacting with an individual he'd seen for 20 minutes, and the Court, plainly in looking at the videotapes and otherwise, believed that this victim was, as a college kid, interacting with someone who did not appear to be someone who would be a heavy user of cocaine. So I guess the point is, as to that, you are actually, you're the purveyor, you're the seller of the narcotics, and you are looking at the buyer and making an impression of who the buyer is. And the Court, in giving the Court the deference the Court is due, the Court, in hearing all of the evidence, believed that that was important. To follow up on Judge Park's question to you, it seems to me that under your theory, any seller of cocaine, regardless of what he or she knew, one who knew absolutely nothing, is liable to this major enhancement because the cocaine he's selling happens to be labeled, I mean, laced with fentanyl. Well, Your Honor, to address that, I think that the point on that front is that there is, because the death resulted, we're in that area where there's a whole range of considerations for the Court to make. And one of them is, was there a knowing risk? I think the defense counsel has, in some ways, taken the word likelihood, redefined it as likely, and then said you have to have something more than 50 percent. If you actually go back and look at the definition of likelihood, it's just a chance. And here, there was a knowing chance that the defendant was actually throwing this adulterated product onto the victim. The victim suffered death. But under your theory, that applies to every seller of cocaine. Well, with all due respect, Your Honor, if there is a death, death changes something, in the same way that if I'm going 140 miles an hour on the highway, and I end up getting into an accident and kill somebody, then that's going to be very different than if I don't. I'm supposed to assess this, I think the guidelines say, in a way similar to how criminal law sets different culpability standards. And so, yes, you think about it, 110 miles an hour, maybe even if I went to a relatively less trafficked area because I really wanted to drive fast, but if someone died as a result of my decision to go that fast on that particular road, did that evidence some, did I take a knowing risk that death might result that would expose me to criminal liability potentially? It's the same sort of analysis, right? I agree, Your Honor. And I notice my time is up. I'm happy to answer any other questions. Thank you. You've been very helpful.  This court in the Ulbricht decision in 2017 said the following, in that they enhanced the risk of death from drugs he sold beyond those already inherent in the trade. We do not think the fact that the ever-present risk of tragedy came to fruition in a particular instance should enhance those sentences. In this case, there is no evidence that Mr. Santiago had any specific knowledge of the particular cocaine at issue. And the court … But you're not, are you arguing, because I thought in your opening argument it did sound like you were making this argument, but if the expert had said there's a 75 percent chance, 85 percent chance, would you still say there must be evidence that he knew the particular cocaine that he distributed was laced with fentanyl? I believe that I would in terms of the extent of any such departure. There's the case, the Gonzales case, that the government cited and we responded to in the reply brief. That case was a defendant who personally mixed chemicals to create his product, and he knew that one of those chemicals was fentanyl. So he had actual knowledge of the particular substance that killed, I think it was one person in that case. He knew. Actual knowledge, particular substance. Also in the decision in the District of Connecticut in the PINA case, which is included in our brief, in that case a person used his substance, became unconscious, couldn't breathe, was taken to the hospital, where after he recovered the doctor told him this substance is very dangerous. And then the exact same particular substance, he sold and three people died. So he had personal knowledge of the particular substance. And in that case, there were three deaths, and the departure was 12 months for each of the three deaths, which is still less than the departure here or the variance here in this particular case, where there's no evidence that he knew of the particular characteristics or properties of this, call it a product. Let's say hypothetically you were authoring the last page of our writing. What would you say? Abuse of discretion? Abuse of discretion. And the conclusion about the knowingly risk, which I think is the key factor in the sentence here and in the guideline, is unsupported. It's just not supported by the evidence. And if this, if Mr. Santiago was knowingly providing a product that had fentanyl, he wouldn't have accompanied him to the blackjack table. He wouldn't have stayed at the blackjack table. He wouldn't have given him his phone number. And he wouldn't have remained at the casino. After he, Santiago, saw the EMTs there, he would have left. So one final point in terms of the family overdoses. There was a family overdose, but it was heroin, not cocaine, laced with fentanyl. The record indicates there was a friend who had overdosed cocaine, fentanyl, but there's no evidence that that occurred before the casino events. So based on our briefs, we would respectfully submit that the judgment should be vacated and the case should be remanded for resentencing. Thank you, counsel. Thank you both, and we will take the matter under advisement.